UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WEYERHAEUSER NR COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:13-00805 |
| ) | Judge Sharp |
| LOUISIANA-PACIFIC CORP., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the Court is Plaintiff Weyerhaeuser NR Company's Motion for Preliminary Injunction (Docket No. 2), by which it seeks to enjoin Louisiana-Pacific Corporation from allegedly infringing Weyerhaeuser's registered mark STRANDGUARD® (or "Strand Guard"). That Motion has been fully briefed by the parties and, on September 9, 2013, the Court heard oral argument on the Motion. For the reasons that follow, the request for preliminary injunctive relief will be denied.[1]

Also pending is Defendant LP's Motion to Strike (Docket No. 33) and that Motion, too, will be denied.

## I. BACKGROUND

According to the allegations in the Verified Complaint, Weyerhaeuser is one of the world's largest producers of wood products, including building materials, and, in 2012, had sales in excess of $3 billion from its wood products division. Among other things, Weyerhaeuser produces a type of engineered wood that has been treated with zinc borate against insect damage and fungal decay.

---

[1] On August 14, 2013, Chief Judge Haynes, after a hearing, denied Plaintiff's request for a Temporary Restraining Order.

1

That product is sold under the STRANDGUARD brand.

Engineered lumber is made from smaller pieces of wood—such as strands, particles, fibers and veneers— which, when glued together, form a lumber product that conforms to precise specifications. The fact that the engineered wood conforms to precise specifications is important to builders because, with traditional sawn lumber, the moisture content and tensile strength can vary widely. Plywood is the best known type of engineered wood.

The specific engineered wood at issue in this case is laminated strand lumber, or LSL. LSL is formed from strands of wood that are bound together parallel with each other and given a finished look. This engineered wood is ideal for interior framing and, specifically, for use as sill plates to which 2x4 studs are attached to form walls. Because sill plates generally rest on concrete, LSL eliminates the need for vapor barriers as the LSL is treated to reduce decay and fungus. Additionally, LSL is less likely to shrink over time, promoting the structural integrity of the walls.

Weyerhaeuser has been using the STRANDGUARD mark for treated LSL products since at least January 2003, and registered that mark for wood-based products and laminated wood products with the United Sates Patent and Trademark office on September 30, 2003. The STRANDGUARD brand is usually presented as "StrandGuard®" or "StrandGuard® TimberStrand® LSL," and looks like this:

2



LP is a direct competitor of Weyerhaeuser, and is also a leading producer of wood products. On July 11, 2013, LP announced a new line of wood products to be treated with zinc borate against termite damage and fungal decay, to be marketed as SOLIDGUARD LSL products, and which looks like this:



Like Weyerhaeuser's competing products, the LP products have zinc borate blended throughout the LSL, and LP touts its new product as being ideal for sill plates, so as to protect the integrity of walls.

In connection with the plans to market SOLIDGUARD, LP filed an intent-to-use application with the United States Patent Office on June 3, 2013, for "laminated veneer lumber; laminated strand lumber, building materials, namely non-metal joists, beams, studs and rim board treated with

3

chemicals that resist insects." This application is pending, and has not been amended to allege use.[2]

On July 10, 2013, LP officially announced the launch of its SOLIDGUARD™ products, and commenced use of the SOLIDGUARD™ Mark in the United States on that same date. LP received its first order for SOLIDGUARD™ LSL on July 11, 2013.

LSL of the type at issue in this case is marketed to builders, structural engineers, architects and similar firms and persons who decide what materials to use in their construction projects. This is a niche market, and Weyerhaeuser concedes that the purchasers of these products "are, in many respects, the opposite of ordinary consumers," and "[t]hey do not make purchasing decisions based on emotion or 'gut feelings,' but based most of all on how the product actually functions and secondarily on cost." (Docket No. 3 at 5). LP is Weyerhaeuser's only competitor in this market.[3]

To promote its LSL, Weyerhaeuser tries to educate architects, engineers, builders and framers about the advantages and benefits of STRANDGUARD for use as sill plates that come in contact with concrete, with the hope that architects and engineers will specify, and builders will choose, STRANDGUARD. Towards that end, Weyerhaeuser utilizes a large external sales team that meet face-to-face with architects, engineers and builders. Weyerhaeuser also conducts seminars, and produces training videos and technical brochures. Its treated LSL products have also been featured in trade publications.

Even though Weyerhaeuser markets its LSL products to architects, engineers and builders,

---

[2] Several years earlier, in May 2010, LP filed an application with the USPTO for the SOLIDGUARD mark. No opposition to the mark was filed and, while the USPTO issued a Notice of Allowance on June 29, 2010, LP allowed the application to lapse in 2012 because, even though LP was using the SOLIDGUARD™ mark in Australia, it had not yet marketed the product in the United States.

[3] As competitors in the LSL market, Weyerhaeuser and LP are generally aware of how the other markets its products.

4

it actually sells the products to large dealers, such as Huskey Building Supply and 84 Lumber, which, in turn, sell primarily to builders and contractors. Because of the cost of this type of LSL product, however, it is not typically sold in retail outlets for the do-it-yourself market, such as Home Depot or Lowe's.

Like Weyerhaeuser, LP does not sell LSL directly to architects, engineers or builders. Instead, LP typically sells LSL to approximately 18 third-party distributors, four of whom currently purchase SOLIDGUARD™ LSL. The distributors, in turn, distribute the LSL to professional dealers who ultimately sell the product to residential and multifamily builders.

Also like Weyerhaeuser, LP seeks to educate architects, engineers and builders about the benefit of its products. Thus, when LP announced the intention to launch SOLIDGUARD®, its sales team contacted distributors, and an article about the product was placed in the June 2013 edition of of LP's captive product magazine titled ENGINEERED WOOD. LP is also currently running targeted marketing campaigns for SOLIDGUARD™ LSL on a national basis which includes sending informational packets to architects and engineers identified by LP's distributors.

When Weyerhaeuser learned that LP intended to market its LSL under the mark SOLIDGUARD, Weyerhaeuser wrote a letter to LP demanding that it not use SOLIDGUARD in connection with LSL treated with zinc borate. That demand was rejected by letter dated July 23, 2013, and this lawsuit followed.

Weyerhaeuser brings federal claims under the Lanham Act for trademark infringement and unfair competition, 11 U.S.C. § 1125 and § 1141; a common law unfair competition claim; a claim for violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104(b); and a claim for violation of Tennessee's anti-dilution statute, Tenn. Code Ann. § 47-25-512. In addition

5

to monetary damages, Weyerhaeuser request preliminary injunctive relief that would enjoin LP from using SOLIDGUARD (or any other mark confusingly similar to STRANDGUARD) in connection with LSL treated against insect and fungal damage or decay.

## II. MOTION TO STRIKE

Accompanying its reply brief, Weyerhaeuser attached two declarations which LP moves to strike because (1) they were filed just two days before hearing on the request for a preliminary injunction in an effort to "patch holes" in the evidence, and (2) they "fail[] to comport with the Federal Rules of Evidence" because, among other things, they contain hearsay and lack foundation. This Motion will be denied.

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure which specifically contemplates striking "redundant, immaterial, impertinent, or scandalous matter" from pleadings. Fed. R. Civ. P. 12(f); see, Fox v. Michigan State Police Dep't, 173 Fed. Appx 372, 375 (6th Cir. 2006). The reply is not a pleading, nor do the declarations contain the type of material contemplated by Rule 12(f).

Moreover, motions to strike are generally disfavored and, rather than striking material, a court may ignore inadmissible evidence. See, Dunavant v. Frito Lay, 2013 WL 816673 at *5 (M.D. Tenn. Mar. 5, 2013); LuJan v. Southwest Airlines Co., 2008 WL 4791490 at *6 (M.D. Tenn. Oct.28, 2008) (noting that motions to strike are disfavored, but considering plaintiff's affidavit only to the extent that it was based on personal knowledge, set forth facts which would otherwise be admissible in evidence and did not directly contradict prior deposition testimony); Berry v. Frank's Auto Body Carstar, Inc., 817 F.Supp.2d 1037, 1041–42 (S.D. Ohio 2011) (footnote omitted) ("But motions to strike are disfavored; a Court should ignore inadmissible evidence instead of striking it

6

from the record"). That is the approach this Court will take, recognizing, of course, that a somewhat relaxed standard applies to consideration of evidence in the context of a request for preliminary injunctive relief. See, Brown v. City of Pittsburgh, 586 F.3d 263, 291 (3rd Cir. 2009); Caron Foundation of Florida, Inc. v. City of Delray Beach, 879 F. Supp.2d 1353, 1360 (S.D. Fla. 2012); Smith v. MPIRE Holdings, LLC, 2009 WL 804069 at *6 (M.D. Tenn. Mar. 25, 2009).

## III. MOTION FOR PRELIMINARY INJUNCTION

In deciding whether to grant an injunction pending a trial on the merits, the Court must consider four factors: (1) whether the party seeking injunctive relief has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the injunction is not entered; (3) the potential harm the injunction would cause the opposing party or others; and (4) the public interest. See, Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012); Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005). "'These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together.'" Northeast Ohio Coalition for Homeless and Service Employees v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006) (citation omitted); accord, United States v. Contents of Accounts, 692 F.3d 601, 608 (6th Cir. 2011). Thus, the Court "'is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue.'" Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting, Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003)).

### A. Likelihood of Success on the Merits

"The touchstone of liability under [the Lanham Act] is whether the defendant's use of the

7

disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 280 (6th Cir. 1997). "In determining whether a likelihood of confusion exists, the Sixth Circuit considers the following factors: '(1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.'" Innovation Ventures, LLC. v. N.V.E., Inc., 694 F.3d 723, 731 (6th Cir. 2012) (quoting, Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir.1982)).

"These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.'" Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1107 (6th Cir. 1991) (accord, Citizens Banking Corp. v. Citizens Finan. Group, Inc., 320 Fed. Appx. 341, 346 (6th Cir. 2009)). "They are also interrelated in effect," and because "[e]ach case presents its own complex set of circumstances[,] not all of these factors may be particularly helpful in any given case." Id. Therefore, "in the course of applying them, '[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" Thema-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 630 (6th Cir. 2002) (citation omitted)

### 1. *Strength of Plaintiff's Mark*

"The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." Gray v. Meijer, Inc., 293 F.3d 641, 646 (6th Cir. 2002). "A mark

is strong if it is highly distinctive, *i.e.* if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." Id.

Weyerhaeuser insists that STRANDGUARD is a strong mark because it is incontestible. It is true that "'[i]ncontestable' trademarks – those that have not been successfully challenged within five years of registration, *see* 15 U.S.C. § 1065 – are presumed to be strong marks." Autozone, Inc. v. Tandy Corp., 373 F.3d 786, 794 (6th Cir. 2004). However,

> [e]ven where a trademark is incontestable and "worthy of full protection," the significance of its presumed strength will depend upon its recognition among members of the public. Treating a valid, incontestable trademark as an exceptionally strong mark for the purpose of determining whether confusion is likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." . . . Although a trademark may be "strong and worthy of full protection" because it is valid and incontestable, . . ., that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur.

Therma-Scan, 295 F.3d at 632 (internal citations omitted).

Apart from asserting that STRANDGUARD is incontestable, Weyerhaeuser offers little else to establish that it is a strong mark in and of itself, as opposed to being used in conjunction with TRU JOIST®, its house mark, and/or TIMBERSTRAND®, its product brand. On the one hand, the Verified Complaint alleges that "Weyerhaeuser sells its LSL products under the brand name TIMBERSTRAND®," but, on the other hand, later alleges that the treated LSL is "sold and marketed under the STRANDGUARD brand." (Docket No. 1, Verified Complaint ¶¶ 13 & 20). Further, Weyerhaeuser markets it treated LSL as "TimberStrand LSL Sill Plates," or "TimberStrand LSL Treated Sill Plates," as being treated with "the patented StrandGuard® process" or

9

"Strandguard® treatment," and it appears that STRANDGUARD is always used in conjunction with TRU JOIST® or TIMBERSTRAND®, at least on the actual product itself, as opposed to in marketing material. (See, Docket No. 20-12 & 20-18). While Weyerhaeuser insists that it spends a lot of time, money and effort in promoting STRANDGUARD, the Verified Complaint only conclusorily supports those contentions, and baldly claims that "the Mark is famous in the building trade as a source of high-quality treated LSL products." (Docket No. 1, Verified Complaint ¶ 36).

In any event, a party may rebut a presumption of strength of an incontestable mark "by proving extensive third party use of similar marks." AutoZone, Inc., 372 F.3d at 794. In its brief, Weyerhaeuser asserts that when looking at StrandGuard and SolidGuard, "[t]here is a substantial risk that customers will remember only these two prominent elements – *i.e.* S + 'guard[.]'" (Docket No. 21 at 3). It also argues that "guard" is a dominant part of its trademark and that "Courts routinely find trademark infringement among marks sharing just a prefix or suffix." (Id. at 21). However, whether the focus is on "S + guard," or "guard," there are plenty in the field that utilize those words, diminishing the strength of STRANDGUARD as a trademark.

The parties agree that International Class ("IC") 019 is the relevant class for wood building products, although it contains more than that. LP has presented evidence showing there are close to 200 live marks in IC 019 incorporating the word "guard" and used in connection with non-metallic building materials and/or treated wood products. These include FIBERGUARD®; TIMBERGUARD®; DRYGUARD®; DENSGUARD®; PROMAGUARD®; XGUARD®; PYRO-GUARD®; LUSTERGARD®; DURA-GUARD; and COP-GUARD®, all of which appear to still be in use. LP has also presented evidence showing that there are almost 30 live marks registered in IC 019 that incorporate the combination of "S + 'guard'" for various non-metallic and

10

wood building materials. These include STRUCTGUARD®; SUMGUARD®; SOIL GUARD®; STYLEGUARD®; and SMARTGUARD®, all of which appear to still be in use.[4]

Upon due consideration, the Court finds this factor of limited value in determining whether there is a likelihood of confusion. Given that it is incontestable, StrandGuard is presumed to be a strong mark, but that presumption is tempered by the fact that the mark appears to be used on the product in conjunction with Weyerhaeuser's house and product marks and by the fact that others in IC 19 have live marks that are in use which contain either "guard" or "S – Guard."

### 2. *The Relatedness of Goods*

"Cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties." Daddy's Junky, 109 F.3d at 282. "First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." Id.

This factor weighs in favor of the finding of likelihood of confusion. There is no question that LP and Weyerhaeuser compete directly, and that they compete directly in the LSL market. Moreover, both STRANDGUARD and SOLIDGUARD are said to deter decay because both are

---

[4] Notwithstanding the fact that "S –Guard" and "guard" appear to be relatively common terms in IC 019, Weyerhaeuser points out that these marks are used in relation to things other than treated LSL, and argue that, in accordance with AutoZone, and Daddy's Junky, LP must show evidence of actual use. However, both cases cite Homeowners Group wherein the Sixth Circuit stated "[i]t is true that merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce," and that "[i]n order to be accorded weight a defendant must show what actually happens in the marketplace." Homeowner' Group, 931 F.2d at 1108. However, the Sixth Circuit also made clear in Homeowner's Group that, in considering the likelihood of confusion, the district court should have considered evidence of similarity where the record contained evidence that "many of the marks are currently registered and believed to be currently in use," and that this remained so even though "more detailed information regarding the nature and extent of use by third-party users of [the marks] may be more persuasive than the information provided[.]" Id.

11

laminated strand lumber that is treated with zinc borate.

### 3. *The Similarity of the Marks*

With regard to similarity of marks, the Sixth Circuit has observed:

> Similarity of marks is a factor of considerable weight. . . . When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks. . . . "The appearance of the litigated marks side by side in the courtroom does not accurately portray market conditions.". . . Rather, courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks "may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark." . . . Moreover, courts must view marks in their entirety and focus on their overall impressions, not individual features.

Daddy's Junky, 109 F.3d at 283 (internal citations omitted).

Weyerhaeuser argues that the marks are highly similar because, as used in commerce, STRANDGUARD is nearly always displayed as StrandGuard, with a capital S and G, just as SolidGuard is displayed with a capital S and G. Further, both marks begin with "S," and both contain the element "guard." In response, LP argues that

> Weyerhaeuser completely disregards LP's use of the word "SOLID" and its own use of "STRAND." Though the two marks begin with the same letter, they are pronounced differently (sä-l.d versus strand), have linguistic differences (three syllables versus two syllables), and have different meanings ("SOLID" relates to the overall structural component of LP's LSL; "STRAND" refers to the individual filaments or fibers comprising LSL). Visually, the marks do not bear any similarities beyond "S + 'guard,'" which . . . are shared with at least 492 live federal registrations, of which a number of these pertain to related goods in IC 019 and are in use.

(Docket No. 18 at 15).

In the Court's opinion, StrandGuard and SolidGuard are similar in that both are two-word phrases, both begin with a word starting with "S," and both conclude with the same word, "Guard." Nevertheless, this similarity is diminished due to the fact that the marks on the LSL appear with their

12

house or band marks, to wit StrandGuard appears with TRU JOIST or TIMBERSTRAND, and SolidGuard appears with LP.

"The use of a challenged junior mark together with a house mark or house tradename can distinguish the challenged junior mark from the senior mark and make confusion less likely." Autozone, Inc., 373 F.3d at 796. While "[t]he presence of [a house mark or trade name] does not eliminate the similarity between the trademarks, . . . this labeling diminishes the likelihood of confusion created by the comparable marks and reduces the importance of this factor." Therma-Scan Inc., 295 F.3d at 633.

The likelihood of confusion is further diminished by the fact that all four ends and edges of LP's SOLIDGUARD™ LSL are painted gray,[5] whereas Weyerhaeuser's StrandGuard LSL appears much as typical lumber in the sense that the edges are not painted. Thus, even where the marks cannot be seen (such as when the LSL is stacked and above eye-level) the products suggest a different origin.

In sum, the Court finds that while there is similarity, this factor is relatively neutral in the analysis.

**4.** *Evidence of Actual Confusion*

Given the newness of introduction of LP's SolidGuard, there is no evidence before the Court of actual confusion. Therefore, this factor, too, is neutral. See, Ignition Athletic Performance Group, LLC v. Hantz Soccer U.S.A., LLC, 245 Fed. Appx 456, 459 (6th Cir. 2007) (where no actual confusion has been shown, "this factor is not in favor of either party").

---

[5] LP utilizes a similar branding technique for its SOLIDSTART® LSL, using orange end and edge seal rather than gray.

13

## 5. *Marketing Channels Used by the Parties*

"Assessing whether the marketing channels used are different 'consists of considerations of how and to whom the respective goods or services of the parties are sold.'" Lucky's Detroit, LLC v. Double L, Inc., ___ F.3d ___, ___, 2013 WL 4034418 at *6 (6th Cir. Aug. 9, 2013). "There is less likelihood of confusion where the goods are sold through different avenues." Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504, 519 (6th Cir. 2007).

The record suggests that both Weyerhaeuser and LP actively seek to educate architects, engineers and builders about the benefit of their products, including LSL, but they utilize different distribution channels, with LP utilizing mostly independent distributors and Weyerhaeuser using many captive distribution centers. Still, whether the products will be in actual competition at the retail level (*i.e.*, end up in the same place giving builders a choice) is an open question at this point.

LP has presented an affidavit from Kimberly Rogers in which she states that "given the costs of dual inventory, the physical size of products such as LSL, and the requirement for customer support, it is rare for a professional dealer to stock two different brands of LSL." (Docket No. 20, Rogers Aff. ¶ 59). Ms. Wells also states that "[g]enerally, a builder will purchase products from a single preferred dealer for all of his or her projects," that a builder "generally maintains long-standing loyalty to their dealers" and that a builder learns to "trust in its dealer's product recommendations and knowledge." (Id. ¶ 61).

Weyerhaeuser has submitted a declaration from Greg Wells who is "skeptical" about the assertion that it would be rare for a dealer to stock two different brands of LSL because it is "fairly common for professional dealers to stock both Weyerhaeuser and LP ELP,"[6] and "[i]f a dealer is

---

[6]Engineered lumber product.

14

willing to stock two brands of ELPs, which are more expensive than regular lumber, are usually physically large and require customer support, [he does] not see why a dealer would avoid stocking two brands of LSL." (Docket No. 32, Wells Decl. ¶¶ 6 & 7). Mr. Wells is also "skeptical" of the statement that a builder will generally purchase products from a single preferred dealer because he "can immediately think of two multi-family constructions projects in the Pacific Northwest in which the material broker purchased multiple brands of ELP." (Id. ¶ 9).

While it is unclear from the present record whether dealers would generally stock both Weyerhaeuser's and LP's LSL, to the extent that they may, any confusion should be lessened due to the fact that both Weyerhaeuser and LP mark their LSL with their house brand, and LP's SolidGuard is visually distinguishable due to its gray painted edges.

In the absence of any real evidence on this issue, this factor does not weigh in favor of confusion.

### 6. *The Probable Degree of Purchaser Care and Sophistication*

During argument on the motion, counsel for Weyerhaeuser hedged a bit when asked about whether the consumer is one in the business, or a general consumer. However, "[t]he appropriate benchmark for assessing the likelihood of confusion is the ordinary consumer who would consider buying the product at issue." Groeneveld Transport Efficiency, Inc. v. Lubecore Intern., Inc., ___ F.3d ___, ___, 2013 WL 4838792 at *9 (6th Cir. Sept. 12, 2013) (citing Frisch's Restaurant, Inc., 759 F.2d at 1266 ("In assessing the similarity of two marks, it is the effect upon prospective purchasers that is important").[7] "[W]hen a buyer has expertise or is otherwise more sophisticated with respect

---

[7] Moreover, "the focus is on 'the typical buyer exercising ordinary caution,' . . . not 'the most obtuse consumer.'" Id. (internal citation omitted).

to the purchase of the services at issue, a higher standard is proper." Homeowner's Group, Inc., 931 F.2d at 1111.

Here, the prospective consumers would be expected to exercise a higher degree of care than the ordinary consumer because architects, engineers and builders are presumably educated about lumber (including engineered wood products), the qualities of such products, and how those products function in specified conditions. See, Jimdi, Inc. v. Twin Bay Docks & Prod., Inc., 501 F.Supp.2d 993, 1005 (W.D. Mich. 2007) ("Given the fact that the predominant purchasers of the parties' products are builders and distributors at the wholesale level, they are more likely to exercise a greater degree of care than would a purchaser of the product at the retail level."). In fact, Weyerhaeuser concedes that the consumers of LSL can be viewed as "the opposite of ordinary customers," because they make purchases based on how the product actually functions. This factor weighs against a likelihood of confusion.

### 7. *Defendant's Intent in Selecting Its Mark*

"'If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.'" General Motors Corp. v. Keystone Auto. Indus., Inc., 453 F.3d 351, 357 (6th Cir. 2006)(quoting, Homeowners Group, Inc., 931 F.2d at 1111). "Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user.'" Id. (quoting, Daddy's Junky, 109 F.3d at 286). "Intent can be proven by direct or circumstantial evidence." Id.

LP has provided an innocent reason for its use of SolidGuard, claiming it developed the mark from two of its existing marks to maintain brand consistency. In this regard, it initially sought to

16

sell treated EWP[8] in both the United States and Australia under it SMARTGUARD® Mark, which LP had used on treated wood products at least as early as 1998. However, LP learned that "SMARTGUARD" was subject to a third-party Australian trademark registration for use in connection with treated wood products, and thus decided to blend two of its existing marks, SOLIDSTART® (for untreated EWP) and SMARTGUARD® (for its treated products), to form the new mark SOLIDGUARD™ for use in connection with treated EWP.

Whether this is a fanciful explanation or what actually occurred remains to be seen because Weyerhaeuser asserts that, after the introduction of STRANDGUARD, LP hired at least two Weyerhaeuser employees who were involved with the development or sale of Weyerhaeuser's LSL products, including STRANDGUARD, and shortly thereafter introduced its own line of LSL products. This suggest LP's familiarity with StrandGuard and its property and, at least circumstantially, suggest that LP's choice of SolidGuard as a mark may not have been entirely innocent. Because "use of a contested mark with knowledge of the protected mark can support a finding of intentional copying," Daddy's Junky, 109 F.3d at 826, the Court finds that this factor weighs in favor of a likelihood of confusion, but only slightly so.

### 8. *Likelihood of Expansion of Product Lines*

The parties agree that there is no likely expansion of the product lines and that this factor is neutral.

### 9. *Conclusion Regarding Factors*

As stated at the beginning of this section, for there to be liability for trademark infringement, there must be a likelihood of confusion among consumers as to the origin of goods. Having fully

---

[8] Engineered Wood Product.

17

considered the relevant factors, and based upon the foregoing analysis, the Court finds that there is little likelihood that the relevant consumers would be misled as to the origin of Weyerhaeuser's StrandGuard or LP's SolidGuard. As such, Weyerhaeuser has not established a strong likelihood of success on the merits, at least at this point in time.

## B. <u>Irreparable Harm to Plaintiff</u>

"[W]here a plaintiff makes a strong showing of likelihood of confusion, irreparable harm follows as a matter of course." Ford Motor Co. v. Lloyd Design Corp., 22 Fed Appx 464, 469 (6th Cir. 2001). This is because irreparable harm is presumed from a defendant's infringement of plaintiff's mark. DaimlerChrysler Corp. v. The Net, Inc., 288 F.3d 201, 208 (6th Cir. 2004).

Weyerhaeuser relies upon this presumed irreparable harm, but as indicated, the Court does not find a strong showing that there is a likelihood of confusion. Therefore, this factor, too, weighs against granting a preliminary injunction. See, Ignition Athletic, 245 Fed. Appx. at 460 (where plaintiff "does not succeed on the merits . . . irreparable harm does not follow").[9]

## C. <u>Substantial Harm to Others</u>

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" Certified Restoration, 511 F.3d at 550-51. LP argues that "consumers will suffer substantial harm if an injunction is issued, because they will have been deprived of a legitimate competition in a niche market in which Weyerhaeuser freely admits" LP is its only competitor. (Docket No. 18 at 23). This, however, is an overstatement because Weyerhaeuser seeks not to ban LP or its LSL from the market, but to ban LP's use of the mark

---

[9] In light of this conclusion, it is not necessary for the Court to reach LP's argument that irreparable harm should not be presumed in trademark cases in light of the Supreme Court's decision in eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 393-94 (2006), which rejected such a presumption in patent cases.

18

SolidGuard. While rebranding could cost LP money, there is no evidence as to how much that would be, and the Court cannot find that the issuance of an injunction would cause substantial harm to others.

**D. The Public Interest**

The last factor in determining whether to grant a preliminary injunction "asks whether the public interest is advanced in issuing" the order. National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club, 372 F.3d 712, 720 n. 4 (6th Cir. 2003). Weyerhaeuser "agrees whole heartedly with LP that 'the public has an interest in fair and robust competition in the marketplace.'" (Docket No. 30 at 23). It argues, however, that "such robust competition be fair," and LP's use of a mark that is confusingly similar "only engenders confusion and *unfair* competition." (Id. at 23, italics in original). This Court has already determined (based solely on the record as it presently exists), however, that LP's use of the SolidGuard mark is not likely to cause confusion. Therefore, the issuance of an injunction would not advance the public's interest.

### III. CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right," and, therefore, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat'l Resources Defense Council, Inc., 555 U.S. 7, 20 & 24 (2008). Because Weyerhaeuser has failed to carry this burden, its Motion for a Preliminary Injunction will be denied. LP's Motion to Strike will also be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

20